# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| JOHN DAVIS, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> MARY CAROLE COONEY, in her official ) capacity as Chairperson of the Fulton ) County Board of Registration and Elections; ) DAVID J. BURGE, in his official capacity as ) Vice-Chair of the Fulton County Board of ) Registration and Elections; LUTHER W. ) BECK, RUKIYA S. THOMAS, and STAN ) MATARAZZO, in their official capacities as ) Members of the Fulton County Board of ) Registration and Elections; and RICHARD ) BARRON, in his official capacity as Chief ) Administrative Officer to the Fulton County ) Board of Registration and Elections, ) <br><br> Defendants. ) | CIVIL ACTION FILE NO. 1:16-CV-03844-ELR |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**COME NOW** Mary Carole Cooney, David J. Burge, Luther W. Beck

Rukiya S. Thomas, Stan Matarazzo, and Richard Barron, in their capacity as

members of the Fulton County Board of Registration and Elections, (collectively

"Defendants" or the Board) and file this Response in Opposition to Plaintiff's

Motion for Temporary Restraining Order ("TRO motion").   Plaintiff's TRO motion seeks to enjoin a referendum – already being voted on through the close of this election cycle on November 8, 2016 -- concerning the incorporation of a proposed "City of South Fulton." Plaintiff is not entitled to a TRO because he cannot establish the requisite elements needed for the issuance of such a drastic remedy by the Court.

In support of their position, Defendants show the Court as follows:

## **INTRODUCTION**

Georgia House Bill 514 (signed into law on April 26, 2016), authorizes a November 2016 referendum for residents of unincorporated Fulton County to vote on the creation of a new "City of South Fulton" (the "City of South Fulton Referendum" or "Referendum").   See H.B. 514, 153d Gen. Assemb., Reg. Sess. (Ga. 2016).   On October 14, 2016, Plaintiff filed a Complaint for Declaratory and Injunctive Relief, and has moved this Court for a Temporary Restraining Order seeking to, "[e]njoin Defendants from holding the City of South Fulton Referendum until such time as the Georgia General Assembly enacts a valid bill authorizing such a referendum, or, alternatively, enjoin Defendants from holding such a referendum until sometime after the Supreme Court of Georgia issues a

final decision in the Cascade Annexation Appeal and the legal issues surrounding the FID and the 1979 LCA are settled." Plaintiff's Complaint at 24.

As specified more fully below, Defendants have no interest in the outcome of the referendum election at issue. However, Defendants object to the issuance of a TRO that would enjoin the referendum because of the hardship that it would place upon Defendants and the impact that the requested relief would have on election operations and the Fulton County citizens who have already voted in the election. Defendants are members of the Fulton County Board of Registrations and Elections and collectively make up the "Superintendent" of elections for Fulton County.

Pursuant to O.C.G.A. §21-2-70, the Superintendent/Defendants are granted the powers to:

> (1)   To receive and act upon all petitions presented by electors, the board of registrars, or the county executive committee of a political party for the division, redivision, alteration, change, or consolidation of precincts;
>
> *       *       *
>
> (3) To prepare and publish, in the manner provided by this chapter, all notices and advertisements, in connection with the conduct of elections, which may be required by law, and to transmit immediately to the Secretary of State a copy of any publication in which a call for a special primary, election, or runoff is issued;

3

(4) To select and equip polling places for use in primaries and elections in accordance with this chapter;

(5) To purchase, except voting machines, preserve, store, and maintain election equipment of all kinds, including voting booths and ballot boxes and to procure ballots and all other supplies for primaries and elections;

(6) To appoint poll officers and other officers to serve in primaries and elections in accordance with this chapter;

(7) To make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections;

(8) To instruct poll officers and others in their duties, calling them together in meetings whenever deemed advisable, and to inspect systematically and thoroughly the conduct of primaries and elections in the several precincts of his or her county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted;

(9) To receive from poll officers the returns of all primaries and elections, to canvass and compute the same, and to certify the results thereof to such authorities as may be prescribed by law;

\*     \*     \*

(11) In any general election at which a proposal to amend the Constitution or to provide for a new Constitution is submitted to the electors for ratification, the election superintendent shall provide copies of the summary of such proposal prepared pursuant to Article X, Section I, Paragraph II of the Constitution as provided in this paragraph. A reasonable number of copies of such summary shall be conspicuously available in each polling place;

\*     \*     \*

(13) To conduct all elections in such manner as to guarantee the secrecy of the ballot and to perform such other duties as may be prescribed by law;

Id.

In anticipation of the 2016 general election, Defendants and their staff have undertaken all of these actions.   If Defendants fail to carry out these duties, Defendants are collectively subject to penalty by the State Election Board.   (See O.C.G.A.   §21-2-30  et seq.).    Moreover, Plaintiff's request would require Defendants to undo or re-do some or all of the above steps, at significant cost and administrative and voter disruption.

## I.    Facts

The General Election is scheduled for completion on November 8, 2016. The creation of the ballot for the November 8, 2016 general election began in July 2016 and was completed prior to September 20, 2016.  (See Affidavit of Richard Barron, attached hereto as Exhibit "A," at ¶2).   The ballot for the November 8, 2016 general election consists of races for the offices of United States President, United States Senate, United States House of Representatives, State Senate, State Representative, as well as local municipal elections, and referendums.   (Barron Aff., ¶6).

5

The Elections Division of the Georgia Secretary of State's Office organizes and oversees all election activity, including Fulton County's voter registration, municipal, state, county and federal elections. They are responsible for certification of election results as well as certifying the preparation of ballots and election forms and materials. (Barron Aff., ¶3).

The Fulton County Board of Registrations and Elections is tasked, by state law, with conducting elections in Fulton County and registering voters who reside within Fulton County in accordance with applicable state and federal election laws. See generally O.C.G.A. §§21-2-70 and 21-2-215.   (Barron Aff., ¶2).   Fulton County is subject to the imposition of fines and penalties from the Secretary of State for election activities that violate state election laws.   For instance, it is a felony to alter, modify or change any aspect of voting equipment without prior approval of the Secretary of State. O.C.G.A. §21-2-582.1. (Barron Aff., ¶4).

Pursuant to O.C.G.A. §21-2-224, any person desiring to vote in a general election, must register to vote by the close of business on the fifth Monday prior to the date of the general election.   The election registration deadline for the 2016 November 8, 2016 election was October 11, 2016.   (Barron Aff., ¶17). Additionally, pursuant to O.C.G.A. §21-2-261(c), the boundaries of a voting

precinct cannot be altered during the 60-day period prior to any general election. Therefore, with respect to the November 8, 2016 election, no precinct boundary could lawfully be altered after September 9, 2016. (Barron Aff., ¶18). The present boundaries for the City of South Fulton Referendum were set by H.B. 514 on July 1, 2016.

Pursuant to O.C.G.A. §21-2-379 *et seq.*, the November 8, 2016 general election is conducted through the use of Direct Recording Electronic ("DRE") voting equipment. (Barron Aff., ¶7). The Center for Election Systems at Kennesaw State University (KSU) in Kennesaw, Georgia, was founded in 2002 for the purpose of supporting the Elections Division of the Office of the Secretary of State of Georgia, in the statewide deployment of a uniform voting system. The Center for Election Systems at KSU programmed the DRE machines, which were prepared, calibrated and tested prior to September 16, 2016. (Barron Aff., ¶8).

The staff of the Department of Registration and Elections is not able to reprogram the DRE machines so as to remove the City of South Fulton referendum from the ballot. Thus, if the Court rules that the City of South Fulton election is to be enjoined, the Department of Registrations cannot readily separate the South Fulton issue from the rest of the ballot questions. (Barron Aff., ¶12).

7

On September 20, 2016, absentee voting commenced for the November 8, 2016 General Election, with the mailing of absentee ballots.    (There were approximately 20,802 valid applications for absentee ballots).    (Barron Aff., ¶9). On September 20, 2016, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), overseas absentee ballots were mailed.  (Barron Aff., ¶10).  As of October 22, 2016, the Fulton County Department of Registration and Elections has received 8,309 absentee ballots, and is awaiting the return of approximately 12,500 additional ballots.  (Barron Aff., ¶11).

The Fulton County Department of Registration and Elections began conducting poll worker training during the period of October 1 through October 14, 2016.  Each poll worker is expected to attend 2 to 3 classes each.  Two hundred and twenty-two advance voting poll workers have been trained and 2,200 election day poll workers have been trained.   (Barron Aff., ¶15).   The Fulton County Department of Registration and Elections has budgeted $2.1 million for the November 8, 2016 general election.  Further, the City of South Fulton Referendum by itself will cost an estimated $178,000.  (Barron Aff., ¶16).

On October 17, 2016, early voting commenced for the November 8, 2016 general election.  Fulton County has 24 early voting sites, open seven days a week.

8

During early voting, registered Fulton County voters can vote at any of these 24 sites. (Barron Aff., ¶13). As of October 22, 2016, Fulton County voters have cast 83,616 early votes throughout the county. (Barron Aff., ¶14).

For the reasons set out below, Defendants request that said Motion for Restraining Order be dismissed in its entirety.

## II.    Argument and Citation of Authority

A. <u>Standard for Issuance of a TRO</u>

"The purpose of a temporary restraining order . . . is to preserve the status quo when the balance of equities so heavily favors the movant that justice requires the court to intervene pending a trial on the merits." <u>A & M Enterprises, Inc. v. Houston</u>, 2001 U.S.Dist. LEXIS 12880 (N.D. Ala. July 30, 2001)(citing <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) and <u>Canal Auth. of Florida v. Callaway</u>, 489 F.2d 567, 572 (5th Cir. 1974)).

To secure a TRO, the movant must demonstrate four elements: "(1) a substantial likelihood of success on the merits; (2) that irreparable harm will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; **and** (4) that entry of the relief

would serve the public interest." <u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (emphasis added).  "[A] preliminary injunction [or TRO] is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four requisites." <u>Four Seasons Hotel and Resorts, B.V. v. Consorcio Barr, S.A.</u>, 320 F.3d 1205, 1210 (11th 2003) (citation and internal quotation marks omitted); <u>United States v. Jefferson County</u>, 720 F.2d 1511, 1519 (11th Cir. 1983).1  Failure to establish any one of the four elements must result in denial of the TRO motion.  <u>See</u> <u>id.</u>; <u>Schiavo</u>, 403 F.3d at 1226.

B.  <u>Plaintiff Cannot Establish the Four Prerequisites for a TRO</u>

Plaintiff's motion fails because he cannot affirmatively prove all four elements required for TRO relief.

1.  **Plaintiff Cannot Show a Substantial Likelihood of Success on the Merits.**

*a. Plaintiff is Unlikely to Win on the Merits Because His Request for Injunctive Relief is Barred by the Doctrine of Laches.*

---

1 "The elements for a temporary restraining order are essentially the same as for a preliminary injunction . . . ." <u>Edgefield Holdings, LLC v. Mason</u>, 2015 WL 4394908, note 5 (N.D. Ga. July 15, 2015)

Laches applies to a request for equitable relief when (1) there was a delay in asserting the claim; (2) the delay was not excusable; and (3) the delay caused the non-moving party undue prejudice. United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005); Kason Indus. v. Component Hardware Group, 120 F.3d 1199, 1203 (11th 1997); see also Costello v. United States, 365 U.S. 265, 282 (1961). Here, Plaintiff waited for an inordinate amount of time before filing suit.  There were a myriad of notable and important dates that Plaintiff let pass before he filed the instant motion:

(1) Plaintiff is intimately aware of House Bill 514; which with its alleged infirmity, was enacted on April 26, 2016 (See Plaintiff's Complaint, ¶ 13).

(2) Because Plaintiff is aware of the contents of House Bill 514, he was aware of the July 1, 2016 deadline for setting the boundaries of the proposed city (H.B. 514 Section 1.11) and the definition of qualified voters set forth in section 7.13 of House Bill 514.

(3) Plaintiff was also aware of the October 3, 2016 ruling of the Supreme Court of Georgia in the case of Fulton County v. City of Atlanta, that reversed the invalidation of the 1979 Local Constitutional Amendment. (See Plaintiff's Complaint, ¶ 10).  And he was aware ostensibly that the appeal was pending prior to the October 3, 2016 opinion.

11

(4) Plaintiff was also aware of the September 20, 2016 ruling in <u>Mays v. City of Atlanta</u>/Cascade Annexation case (<u>See</u> Plaintiff's Complaint, ¶ 26).  And he was ostensibly aware that the case was pending <u>prior to the ruling.</u>

(5) Plaintiff was aware that absentee voting started on September 20, 2016 (<u>See</u> Plaintiff's Complaint, ¶ 34).

(6) Plaintiff is aware that the voter registration deadline was October 11, 2016 (<u>See</u> Complaint, ¶ 35).

(7) Plaintiff is aware that early voting started on October 17, 2016 (<u>See</u> Complaint ¶ 36).

Indeed, Plaintiff's decision not to pursue his claim until after voting on the referendum already has begun demonstrates both a lack of urgency and a lack of imminent or irreparable injury.  Plaintiff and his attorneys were well aware as early as April 2016, when Georgia House Bill 514 was signed into law, that the referendum would appear on the November 2016 ballot, but took no legal action then.  Indeed, H.B. 514 specifically directs the County's election superintendent to "set the date of such election [regarding the City of South Fulton referendum] for the Tuesday next following the first Monday in November, 2016."  H.B. 514, § 7.14.

Plaintiff and his attorneys also knew or should have known, as early as July 1, 2016, the potential boundaries for the proposed City of South Fulton, and could have filed suit then.  H.B. 514, § 1.11.  Indeed, given ongoing litigation cited in his own brief, Plaintiff and his attorneys knew or should have known, as early as March 18, 2015, that a legal determination regarding the Fulton County Industrial District (FID) could impact the FID's inclusion in or exclusion from any municipality subsequently incorporated in South Fulton County.  Cf. Plaintiff's Motion at p. 4-5 (describing the procedural history of litigation seeking to void the local constitutional amendment that established the FID).  Plaintiff's own counsel, Robert Highsmith, was involved in litigation related to that issue.   As such, Plaintiff and his attorneys could have brought suit well before voting on the referendum had already commenced. However, Plaintiff has inexplicably waited until the requested relief would impose significant burdens on county election officials and on citizens who have already voted or intend to vote on the referendum.  Plaintiff's claims are barred by the doctrine of laches and thus he is not likely to be successful on the merits.

> *b. Plaintiff is Unlikely to Succeed on the Merits Because He Has no Proof to Support His Allegation of Debasement and Vote Dilution.*

To prevail on an equal protection claim, Plaintiff must establish intentional discrimination or, at a minimum, "disproportionate impact."  Batson v. Kentucky,

476 U.S. 79, 93 (1986).  Such proof must "impl[y] more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Personnel Administrator of Mass. V. Feeney, 442 U.S. 256, 279 (1979) (citations omitted). As applied here, this standard would require Plaintiff to prove that he and other residents of the proposed City of South Fulton were singled out for differential treatment, as compared to residents of the FID, the Cascade Annexation Area or some other geographical group.  Plaintiff, however, has failed to identify or preview any such evidence of intent.  Indeed, given that he neither knows the outcome of the referendum or individual voter preference, he cannot even establish that residents of the proposed city are disproportionately impacted.

In arguing that he is likely to succeed on the merits, Plaintiff makes broad pronouncements and relies on boilerplate language -- regarding "the right to vote," "the right to have one's vote counted," "one person, one vote" -- to arbitrarily conclude that  "debasement or dilution . . . of a citizen's vote" will result if the referendum is allowed to proceed.  Plaintiff's Motion at p. 11-13.  Although these are all noteworthy voting rights principles, Plaintiff's contention that they are put in jeopardy by the current referendum is, at best, hyperbolic.

14

Indeed, Plaintiff's argument regarding vote dilution suffers from several fundamental flaws. It assumes, without proof, that voters within the FID and the Cascade Annexation Area will vote contrary to the interests of Plaintiff and other South Fulton voters. It assumes, without proof, that each of these sets of voters – FID, Cascade, and other South Fulton residents – will vote as a monolith within their respective group. It assumes, without proof, that Plaintiff's desired outcome regarding the issue of cityhood is shared by a majority of South Fulton residents and opposed by a majority of FID and Cascade residents. It purports to predict the vote of each constituent, even before votes are cast. See generally Plaintiff's Motion at p. 14-16 (arguing that votes by nonresidents will "cancel[] out" the votes of residents of the proposed city).

For these same reasons, Plaintiff's reliance on the vote dilution case law cited in his brief is also misplaced. See Plaintiff's Motion at 12-14 (citing case law on which Plaintiff relies). Unlike in those cases, Plaintiff has presented no proof that any individual or group of FID or Cascade voters has more voting power than any other South Fulton resident. Cf. id. To the contrary, Plaintiff's contention appears to be that FID and Cascade voters have the same voting power as other South Fulton residents. See id. at 14-15. But, because the incorporation of the proposed City of South Fulton arguably could impact residents of FID and Cascade

who live in or around the proposed city, their vote should be given equal weight as well.  Cf. Town of Lockport, New York v. Citizens for Community Action at the Local Level, Inc., 430 U.S. 259, 271-72 (1977) (finding no violation of Fourteenth Amendment's Equal Protection Clause where majority votes of city and non-city voter blocs were given similar weight in a referendum regarding the county's charter); see also id. at 265-66 (recognizing that applicability of the one-person, one-vote equal protection principle differs in representative elections, as compared to referendum votes).[2]

## 2.    Plaintiff Cannot Show that He Will Suffer Irreparable Harm.

Having failed to establish a likelihood of success on the merits, Plaintiff's "argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit."  Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 578 (6th Cir. 2002).

Plaintiff's allegation of irreparable injury is simply without merit.  Allowing the vote on the referendum to proceed, as planned, does not prevent Plaintiff from securing the relief that he ultimately seeks, i.e., invalidation of H.B. 514.  See

---

[2] Ironically, by barring, in the midst of the election, certain sectors of South Fulton residents from voting on the referendum, Defendants would likely expose themselves to another equal protection lawsuit, this time from the excluded constituents.

16

Plaintiff's Complaint at ¶ 23 (asking the Court to "[d]eclare HB 514 unconstitutional, null, and void").   Indeed, if the Court ultimately rules in Plaintiff's favor regarding H.B. 514, the outcome of the referendum either would be rendered void (to the extent the outcome favors incorporation) or moot (if the outcome is against incorporation).   In other words, Plaintiff still can secure the outcome he desires – without a TRO -- either through the result of the referendum or by way of his lawsuit-in-chief.   As such, he cannot prove that irreparable injury would result if the Court denies his motion.[3]   Cf. Northeastern Florida Chapt. of Ass'n of General Contractors of America v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) (" 'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' ") (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

**3.     The Threatened Injury does not Outweigh the Harm to the Non-Movant.**

For the reasons discussed above, Plaintiff will not suffer irreparable injury if voting on the referendum proceeds.   By contrast, requiring the Defendants to halt voting on the referendum -- when it already has begun -- would cause significant

---

[3] Similarly, if the Court ultimately finds that H.B. 514 is constitutional, then Plaintiff's basis for challenging the referendum is undermined.

administrative upheaval, financial cost and voter confusion.   (Barron Aff., ¶21). These outcomes, in turn, would undermine voter confidence in the electoral process, the integrity of that process and trust in the government entities and officials who administer the electoral system.

On a motion for preliminary injunction, the plaintiff bears the burden of showing that the perceived injury outweighs the damages that the preliminary injunction might cause to the defendants.  Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988).  Here, the harm to Defendants is significant. An injunction would interfere with the County's election processes which are already underway.

Plaintiff has not shown that he will suffer irreparable harm if a preliminary injunction is not granted. "A showing of irreparable harm is the 'sine qua non' of injunctive relief." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir.2000) (citations omitted). When a plaintiff fails to show a likelihood of success on the merits, claims for irreparable injury based on an alleged constitutional injury have no merit.  Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 578 (6th Cir. 2002). Here, Plaintiff has failed to show irreparable harm because he has not shown a likelihood of success on the merits.

### 4.    A TRO Would Be Averse to the Public Interest.

Similarly, Plaintiff's request to suspend voting on the referendum is an unreasonable and impractical request that is contrary to the public interest. Voting on the referendum already has commenced and suspending it, midstream, would nullify the votes already cast and those that continue to be cast. Indeed, voting in Fulton County commenced over a month ago, on September 30, 2016 when absentee ballots became available. In-person voting also has begun, as of October 17, 2016. As such, Fulton County voters already have cast their votes on the referendum and will continue to do so through the close of voting on November 8, 2016. It would be contrary to the public interest to essentially nullify the votes of citizens who already have voted, without notice or an opportunity to be heard.[4] Beyond nullifying the votes of citizens who voted in good faith, such an action would undermine public confidence in the electoral process at a time when the integrity of that process is already being questioned and challenged by certain candidates and voters this election cycle. Plaintiff has not cited to any case law authorizing the midstream suspension of voting and Defendants' research has

---

4 Indeed, at this early stage of Plaintiff's lawsuit seeking to void H.B. 514, many voters would not even know or comprehend why voting on the referendum was being halted midstream, further undermining the integrity of the process.

uncovered none.[5]

## III.  Conclusion

For all of the above reasons, Defendants respectfully request that the Court

deny Plaintiff's TRO motion.

Respectfully submitted, this 24th day of October, 2016.

**OFFICE      OF      THE      COUNTY
ATTORNEY**

**s/Kaye Woodard Burwell**
Georgia Bar Number:   775060
kaye.burwell@fultoncountyga.gov

**s/Cheryl Ringer**
Georgia Bar Number: 557420
cheryl.ringer@fultoncountyga.gov

**s/David R. Lowman**
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov

---

[5] As required by Rule 65(c), the Court may not impose a temporary restraining order without considering what amount would be proper to pay costs and damages sustained by a party found to have been wrongfully enjoined or restrained. The amount of an injunction bond is a matter within the sound discretion of the district court. See Carillon Importers, Ltd. v. Frank Pesce Int'l Group, Ltd., 112 F.3d 1125, 1127 (11th Cir. 1997).

ATTORNEYS FOR DEFENDANTS

Office of the County Attorney
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
Telephone: (404) 612-0246

P:\CALitigation\Elections\John Davis v. Mary Cooney, et al 1-16-CV-03844-ELR\Pleadings\10.24.2016 Davis v. Cooney - FC BRE - Resp in
Opposition to TRO(final).docx

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO. |
| | ) | 1:16-CV-03844-ELR |
| v. | ) | |
| | ) | |
| MARY CAROLE COONEY, in her official | ) | |
| capacity as Chairperson of the Fulton | ) | |
| County Board of Registration and Elections; | ) | |
| DAVID J. BURGE, in his official capacity as | ) | |
| Vice-Chair of the Fulton County Board of | ) | |
| Registration and Elections; LUTHER W. | ) | |
| BECK, RUKIYA S. THOMAS, and STAN | ) | |
| MATARAZZO, in their official capacities as | ) | |
| Members of the Fulton County Board of | ) | |
| Registration and Elections; and RICHARD | ) | |
| BARRON, in his official capacity as Chief | ) | |
| Administrator to the Fulton County Board | ) | |
| of Registration and Elections, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE WITH LR 5.1</u>

I hereby certify that **DEFENDANTS' RESPONSE IN OPPOSITION TO**

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** has

been prepared using 14-point Times New Roman and is in the format required by

22

LR 5.1. Further, I certify that a copy of this pleading has been filed electronically

with the Clerk of Court using the CM/ECF system which will send notification of

the filing to the following attorneys of record:

> Robert S. Highsmith, Jr.
> Keisha O. Coleman
> Lindsey Sciavicco

This 24th day of October, 2016.


> **s/David R. Lowman**
> David R. Lowman
> Georgia Bar Number: 460298
> Attorney for Defendants

Office of the County Attorney
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
Telephone: (404) 612-0246
david.lowman@fultoncountyga.gov

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN DAVIS,<br><br>    Plaintiff,<br><br>v.<br><br>MARY CAROLE COONEY, in her official<br>capacity as Chairperson of the Fulton<br>County Board of Registration and Elections;<br>DAVID J. BURGE, in his official capacity as<br>Vice-Chair of the Fulton County Board of<br>Registration and Elections; LUTHER W.<br>BECK, RUKIYA S. THOMAS, and STAN<br>MATARAZZO, in their official capacities as<br>Members of the Fulton County Board of<br>Registration and Elections; and RICHARD<br> BARRON, in his official capacity as Chief<br>Administrator to the Fulton County Board<br>of Registration and Elections,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE NO.<br>1:16-CV-03844-ELR |

## AFFIDAVIT OF RICHARD BARRON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Richard Barron, who appeared before the undersigned notary public duly authorized to administer oaths in this state and after being sworn, deposes and says as follows:

1.

I am Richard Barron.  I am more than 21 years old and I am under no legal disability which would prevent me from giving this affidavit.  I am giving this affidavit based on my own personal knowledge as Fulton County Director of Registration and Elections. This affidavit is made for use as evidence in the above-styled case.

2.

The Fulton County Board of Registrations and Elections is tasked, by state law, with conducting elections in Fulton County and registering voters who reside within Fulton County in accordance with applicable state and federal election laws. See generally O.C.G.A. §§21-2-70 and 21-2-215.

3.

The Elections Division of the Georgia Secretary of State's Office organizes and oversees all election activity, including Fulton County's voter registration, municipal, state, county and federal elections. They are responsible for certification of election results as well as certifying the preparation of ballots and election forms and materials.

4.

Fulton County is subject to the imposition of fines and penalties from the Secretary of State for election activities that violate state election laws.  For instance, it is a felony to alter, modify or change any aspect of voting equipment without prior approval of the Secretary of State.  O.C.G.A. §21-2-582.1.

5.

The creation of the ballot for the November 8, 2016 general election began in July 2016 and was completed prior to September 20, 2016.  The ballot was certified by the Georgia Secretary of State.

6.

The ballot for the November 8, 2016 general election consists of races for the offices of United States President, United States Senate, United States House of Representatives, State Senate, State Representative, as well as local municipal elections, and referendums.

7.

Pursuant to O.C.G.A. §21-2-379 *et seq.*, the November 8, 2016 general election is conducted through the use of Direct Recording Electronic ("DRE") voting equipment.

8.

The Center for Election Systems at Kennesaw State University (KSU) in Kennesaw, Georgia, was founded in 2002 for the purpose of supporting the Elections Division of the Office of the Secretary of State of Georgia, in the statewide deployment of a uniform voting system.   The Center for Election Systems at KSU programmed the DRE machines, which were prepared, calibrated and tested prior to September 16, 2016.

9.

On September 20, 2016, absentee voting commenced for the November 8, 2016 General Election, with the mailing of absentee ballots.  (The Fulton County Department of Registration and Elections has received approximately 20,802 valid applications for absentee ballots).

10.

On September 20, 2016, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) overseas absentee ballots were mailed.

11.

As of October 22, 2016, the Fulton County Department of Registration and Elections has received 8,309 absentee ballots, and is awaiting the return of approximately 12,500 additional ballots.

12.

The staff of the Department of Registration and Elections is not able to reprogram the DRE machines so as to remove the City of South Fulton referendum from the ballot.  Thus, if the Court rules that the City of South Fulton election is to be enjoined, the Department of Registrations cannot readily separate the South Fulton issue from the rest of the ballot questions.

13.

On October 17, 2016, early voting commenced for the November 8, 2016 General Election.  Fulton County has 24 early voting sites, open seven days a week.   During early voting, registered Fulton County voters can vote at any of these 24 sites.

14.

As of October 22, 2016, Fulton County voters have cast 83,616 early votes throughout the county.

15.

The Fulton County Department of Registration and Elections began conducting poll worker training during the period of October 1 through October

14, 2016.  Each poll worker is expected to attend 2-3 classes each.  222 advance voting poll workers have been trained and 2,200 election day poll workers have been trained.

16.

The Fulton County Department of Registration and Elections has budgeted $2.1 million for the November 8, 2016 general election.  Further, the City of South Fulton Referendum by itself will cost an estimated $178,000.

17.

Pursuant to O.C.G.A. § 21-2-224, any person desiring to vote in a general election, must register vote by the close of business on the fifth Monday  prior to the date of the general election.   The election registration deadline for the 2016 November 8, 2016 election was October 11, 2016.

18.

Pursuant to O.C.G.A. § 21-2-261(c), the boundaries of a voting precinct cannot be altered during the 60-day period prior to any general election. Therefore, with respect to the November 8, 2016 election no precinct boundary could lawfully be altered after September 9, 2016.

19.

Requiring the Defendants to halt voting on the City of South Fulton referendum – when it already has begun -- would cause administrative upheaval, financial cost and voter confusion.

20.

At this point in the election process, it would be impossible to now change either the electronic or paper ballot to remove the South Fulton referendum.

21.

To suspend the referendum vote, in the midst of an ongoing election, this court would have to advise voters to ignore the referendum already present on their ballots.

22.

The process of nullifying ballots cast or instructing voters to simply ignore the referendum on the ballot would create significant administrative, logistical and financial ramifications and upheaval.

**(SIGNATURE ON THE FOLLOWING PAGE)**

**FURTHER AFFIANT SAYETH NOT.**

Executed in Fulton County, Georgia this _____ day of October, 2016.


_____
RICHARD BARRON
Director, Fulton County Department of
Registration and Elections


SWORN to and subscribed

before me this_____ day

of October, 2016.


_____

Notary Public

My Commission Expires:_____